**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

REGAL-BELOIT CORPORATION;
VICTORY FIREWORKS, INC.; PICC
PROPERTY & CASUALTY COMPANY
LIMITED SHANGHAI BRANCH; ROYAL
SUN ALLIANCE INSURANCE CO. LTD.,
            *Plaintiffs-Appellants,*

                v.

KAWASAKI KISEN KAISHA LTD.;
K-LINE AMERICA, INC.; UNION
PACIFIC RAILROAD COMPANY,
            *Defendants-Appellees.*

No. 06-56831

D.C. No.
CV-06-03016-DSF

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
June 10, 2008—Pasadena, California

Filed February 4, 2009

Before: Stephen Trott, Sidney R. Thomas and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

1257

## COUNSEL

Alan Nakazawa, Cogswell Nakazawa & Chang, LLP, Long Beach, California, for defendants-appellees Kawasaki Kisen Kaisha, Ltd. and K-Line America, Inc.

Leslie G. McMurray, Valley Village, California, for defendant-appellee Union Pacific Railroad Company.

Dennis Cammarano, Long Beach, California, for the plaintiffs-appellants.

## OPINION

FISHER, Circuit Judge:

This case requires us to determine which federal statute governs "a maritime case about a train wreck," where the parties' agreement for carriage of goods from China into the United States by sea and then by rail included a Tokyo forum selection clause that would violate one federal law, but would be enforceable under another. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S.14, 18 (2004). Regal-Beloit and several other named plaintiffs contracted with defendant Kawasaki Kisen Kaisha, Ltd. ("K-line") to ship their goods from China to various American Midwestern destinations via the Port of Long Beach in California.[1] K-line issued a through bill of lading to each shipper to cover the shipment from China all the way to the inland destinations, choosing the Carriage of Goods by Sea Act as the law to govern the carriers' responsibility during shipment. Although K-line's own ocean liner carried the

---

[1]Plaintiffs in this case include the following parties: Regal-Beloit is a non-California corporation with an office in Beloit, Wisconsin that purchased a cargo of electric motors to be shipped from Shanghai, China to Indianapolis, Indiana; Victory is a corporation authorized to do business in California with an office in Ellsworth, Wisconsin that purchased a cargo of fireworks to be shipped from Beihai, China to Minneapolis, Minnesota; PICC is a foreign insurance corporation with an office in Shanghai that was the subrogated insurer of a cargo of electric motor parts to be shipped from Shanghai, China to Milwaukee, Wisconsin; and Royal & Sun was the subrogated insurer of a cargo of retainer nail castings to be shipped from Zhangjiagang, China to Chicago, Illinois. The actions were consolidated under Regal-Beloit's named complaint on August 7, 2006. All shipments entered the United States via the Port of Long Beach. We generally refer to the plaintiffs collectively as "Plaintiffs." We also generally refer to defendants Kawasaki Kisen Kaisha, K-line America and Union Pacific Railroad Company as "Defendants."

goods from China to Long Beach, its United States agent, K-line America ("KAM"), subcontracted with United Pacific Railroad Company ("UPRR") to transport these goods from Long Beach to the inland destinations. K-line is KAM's corporate parent, handling its domestic business dealings through KAM, including dispatching and receiving vessels and negotiating its inland shipping with domestic carriers like UPRR. Plaintiffs' cargo was allegedly damaged when UPRR's train derailed in Oklahoma. Plaintiffs filed a breach of contract suit against Defendants in California Superior Court. After UPRR removed the case to the district court, K-line and KAM moved to dismiss under the Tokyo forum selection clause in K-line's initial agreement with Plaintiffs. The district court granted the motion to dismiss, determining that the parties successfully avoided the strict venue limitations that apply by default to the rail portions of these shipments as a matter of federal law under the Carmack Amendment. The dismissal provides us jurisdiction under 28 U.S.C. § 1291.

The outcome of this case turns on the answers to two questions, the *first* being which statutory framework should apply: the Carmack Amendment ("Carmack"), which provides the default rules governing the inland rail leg of a shipment between a foreign country and a point in the United States, or the Carriage of Goods by Sea Act ("COGSA"), which is what the parties contractually agreed would govern?[2] A reasonable forum selection clause typically is enforceable under COGSA,

---

[2]Both Carmack and COGSA have been codified at several different sections of Title 49 since their enactments. "Originally codified at 49 U.S.C. § 20(11), Carmack was recodified in 1978 at 49 U.S.C. § 11707 and then recodified again in 1996 at 49 U.S.C. § 14706. The current version of Carmack is codified at 49 U.S.C. § 11706." *Sompo Japan Ins. Co. v. Norfolk S. Ry. Co.*, 540 F. Supp. 2d 486, 492 n.4 (S.D.N.Y. 2008) [hereinafter *Sompo II*] (internal citations omitted). COGSA was originally codified at 46 U.S.C. §§ 1301-1315, which is how the statute is cited in most of the relevant case law. Congress recodified portions of Title 46 of the United States Code as positive law in October 2006, and in so doing, moved COGSA to the notes section of 46 U.S.C. § 30701.

but such a clause is valid under Carmack *only* if the parties fulfill one of Carmack's two statutory methods for contracting out of the statute's venue restrictions. Applying this circuit's precedent dictates that contractually extending COGSA to the inland rail leg cannot trump the statutory force of Carmack's default responsibility regime unless the parties properly agree to opt out of Carmack and thereby remove the statutory barrier to choosing COGSA as the governing law. We therefore reach a *second* question: which of Carmack's two statutory opt out provisions applies to a contract for rail service that, like the contract here, has been exempted from regulation by the Surface Transportation Board? Unlike the district court, we conclude that the applicable requirements for opting out of Carmack are found in 49 U.S.C. § 10502, instead of § 10709. We thus reverse and remand to the district court to determine whether the parties contracted out of Carmack's venue restrictions under § 10502 so as to make the Tokyo forum selection clause valid and enforceable.

## BACKGROUND

To ship their goods, Plaintiffs each entered into an intermodal through bill of lading with K-line that covered the entire transport from China to the Midwest.[3] In pertinent part, the bills of lading included the following provisions:

> 1. (**Definitions & Tariff**) . . . (b) 'Carrier' means [K-line], her owners, operators and charterers whether acting as carrier or bailee. . . . (d) 'Connecting Carrier' means carriers (other than Carrier), contracted by or acting on behalf of Carrier,

---

[3]A bill of lading is a contract that "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Kirby*, 543 U.S. at 18-19. "Through" bills of lading specifically cover both oceanic and inland legs of a journey in a single document. *See id.* at 25-26. "Intermodal" refers to the use of more than one method of transport during a single shipment. *See id.* at 25.

participating in Carriage of Goods by land, water or air under this Bill of Lading. . . . (j) 'Vessel' includes the vessel named on the face hereof, any vessel, lighter, barge, ship, watercraft or any other means of water transport and any other vessel owned, operated, chartered or employed (in whole or in part) by Carrier or any Connecting Carrier and used in whole or in part for carriage of Goods under this Bill of Lading.

2. **(Governing Law and Jurisdiction)** The contract evidenced by or contained in this Bill of Lading shall be governed by Japanese law except as may be otherwise provided for herein, and any action thereunder or in connection with Carriage of Goods shall be brought before the Tokyo District court in Japan, to whose jurisdiction Merchant irrevocably consents.

. . . .

4. **(Responsibility for Shipments To, From, or Through US Territories)** (1) With respect to Goods shipped to, from, or through US Territories, Carrier's responsibilities during the entire period (and not just during Water Carriage) from the time of receipt of Goods to the time of delivery of Goods shall be governed by [COGSA], and [COGSA] shall be deemed incorporated herein during the entire aforesaid period . . . .[4]

5. **(Sub-Contracting: Exemptions, Immunities, Limitations, etc. of Participant(s))** (1) Carrier shall be entitled to sub-contract on any terms whatsoever

---

[4]A clause such as this, "which identifies the law that will govern the rights and liabilities of all parties to the bill of lading," is often referred to as a "clause paramount." *Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.*, 456 F.3d 54, 56 (2nd Cir. 2006) [hereinafter *Sompo I*].

Carriage, including without limitations, the loading, unloading, storing, warehousing, handling and any and all duties whatsoever undertaken by Carrier in relation to Goods by any of the following (I) any Connecting Carrier . . . . (2) . . . [E]very such vessel and Such Participant(s) shall have the benefit of all provisions herein benefiting [sic] Carrier as if such provisions were expressly for their benefit; and, in entering into this contract, Carrier, to the extent of those provisions, does so not only on its own behalf, but also as agent and trustee for such vessel and Participant(s).[5]

K-line's ocean carriers shipped the cargo from China to Long Beach. From there, the cargo was transferred to UPRR, with whom KAM had contracted to transport the cargo from the Port of Long Beach to the various inland destinations. This agreement was memorialized in the Exempt Rail Transportation Agreement ("ERTA"), which explicitly stated that "[l]iability for freight loss and damage to lading while under the control of [UPRR] shall be governed by MITA [the Master Intermodal Transportation Agreement]." The MITA provided that the MITA plus any bills of lading constituted the entire contract between the parties, and included its own forum selection clause that stated that "[a]ll lawsuits for freight loss or damage must be filed in a court of competent jurisdiction in Omaha, Douglas County, Nebraska." The MITA also (1) prohibited the interpretation of its terms under foreign law; (2) explicitly provided that "[t]his MITA and any agreements, price documents or contracts that reference this MITA have been made under 49 U.S.C. § 10709"; and (3) expressly established that "Carmack liability coverage is *not* available for any Shipments that originate outside the borders of the United States of America."

---

[5]A clause such as this, which extends a bill of lading's defenses and limitations to downstream parties who have subcontracted with the Carrier, is often referred to as a "Himalaya clause." *See Kirby*, 543 U.S. at 20 & n.2.

Unfortunately, the UPRR train carrying the aforementioned cargo derailed in Tyrone, Oklahoma. Based on the alleged damage to the cargo, Plaintiffs filed suits against Defendants in Los Angeles County Superior Court. UPRR removed the cases to the Federal District Court for the Central District of California. Once the cases were removed, Defendants moved to dismiss the actions, relying on the Tokyo forum selection clause in the bills of lading. The district court granted their motion. *See Regal-Beloit Corp. v. Kawasaki Kisen Kaisha, Ltd.*, 462 F. Supp. 2d 1098, 1105 (C.D. Cal. 2006).

The district court concluded that the Tokyo forum selection clause was reasonable, and that KAM and UPRR could enjoy its benefits under the Himalaya Clause. *See id.* at 1102-03. It went on to determine that Carmack's venue restrictions applied neither to the overseas leg of the cargo shipment, which were instead governed by COGSA, nor to the inland leg of the cargo shipment. *See id.* at 1103-04. With respect to the inland leg, the district court explained that although this transport would typically be subject to Carmack's restrictions, here the parties entered into the bills of lading under 49 U.S.C. § 10709, thereby enabling the parties to contract out of the Carmack Amendment's terms. *See id.*

We disagree. Under our case law, Carmack — not COGSA — must govern Defendants' liability for the inland rail transport here. Therefore, Tokyo is an acceptable forum under the provisions of Carmack only if the parties satisfied the applicable requirements under either § 10709 or § 10502 for contracting out of Carmack's default venue restrictions. As we explain below, a careful reading of Carmack reveals that § 10709 does not govern the kind of carriage at issue in this case and the district court therefore erred by applying that section instead of § 10502. Accordingly, we reverse and remand so the district court can determine in the first instance whether the parties complied with § 10502.

## STANDARD OF REVIEW

We reject Defendants' argument in favor of the abuse of discretion standard of review, which applies only to a district court's factual finding regarding a forum selection clause's reasonableness. *See Kukje Hwajae Ins. Co.*, *v. The "M/V Hyundai Liberty*," 408 F.3d 1250, 1254 (9th Cir. 2005). Here, the parties concede that the forum selection clause is reasonable. Instead, the dispute turns on which statutory law applies and whether this body of law voids the forum selection clause regardless of its reasonableness. We review these issues of statutory interpretation de novo. *See Chateau Des Charmes Wines, Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 530 (9th Cir. 2003); *Richards v. Lloyd's of London*, 135 F.3d 1289, 1292 (9th Cir. 1998) (en banc).

## DISCUSSION

### I.  Statutory Provisions

Because of their centrality to our analysis, we summarize the relevant provisions of Carmack and COGSA before turning to the question of which statute applies here.

Congress added the Carmack Amendment to the Interstate Commerce Act in 1906. Carmack, which governs rail and motor carriers that are under the jurisdiction of the Surface Transportation Board ("the Board," previously referred to as the Interstate Commerce Committee, or "the ICC"), narrowly limits the venues in which a claim may be brought. Carmack dictates that:

> [a] civil action under this section may only be brought (i) against the originating rail carrier, in the judicial district in which the point of origin is located; (ii) against the delivering rail carrier, in the judicial district in which the principal place of business of the person bringing the action is located if

> the delivering carrier operates a railroad or a route through such judicial district, or in the judicial district in which the point of destination is located; and (iii) against the carrier alleged to have caused the loss or damage, in the judicial district in which such loss or damage is alleged to have occurred.

49 U.S.C. § 11706(d)(2)(A). A "judicial district" is defined as "a judicial district of the United States" or "the applicable geographic area over which [a state] court exercises jurisdiction." 49 U.S.C. § 11706(d)(2)(B). Given these restrictions, forum selection clauses are generally forbidden under Carmack. Notably, however, Congress has since added a series of provisions designed to deregulate aspects of the railroad industry. *See Tokio Marine & Fire Ins. Co. v. Amato Motors, Inc.*, 996 F.2d 874, 877 (7th Cir. 1993). Collectively referred to as the Staggers Rail Act, these provisions establish two mechanisms by which rail and motor carriers can contract out of Carmack's restrictions if they satisfy the applicable statutory requirements. *See* 49 U.S.C. §§ 10502(a), 10502(e), 10709(a), 10709(c)(1).

By its terms, COGSA covers transport only between a foreign and American port "from the time when the goods are loaded on to the time when they are discharged from the ship" — commonly referred to as "tackle-to-tackle." 46 U.S.C. § 30701 Notes Sec. 1(e). COGSA does, however, explicitly authorize sea carriers and shippers to extend its rules contractually to cover inland transportation or transportation between two American ports. *See* 46 U.S.C. § 30701 Notes Sec. 7, 13. Unlike Carmack, COGSA does not include any venue restrictions that would prohibit the enforcement of a forum selection clause.

## II.  The Carmack Amendment vs. COGSA

It is undisputed that the responsibility clauses in the bills of lading purport to extend the application of COGSA to the

entire period of transport, and that the Himalaya Clause extends the full benefits of the bills of lading to all of the carrier's subcontractors "as if such provisions were expressly for their benefit." Nevertheless, Plaintiffs argue that Carmack's venue restrictions should still govern because Carmack's statutory force "trumps" the parties' attempt to contractually extend COGSA.[6] Defendants respond that Carmack cannot apply to the inland rail carriage because the entire shipment was governed by through bills of lading, whereas a *separate* domestic bill of lading is necessary for Carmack to apply to inland transport. In the alternative, Defendants assert that even if the Carmack Amendment could apply in the absence of a separate bill of lading for the domestic carriage, in this case COGSA should govern in light of the parties' express agreement to extend COGSA's provisions to all subcontractors, as reflected in the bills of lading. Defendants fairly argue that policies recently endorsed by the Supreme Court — such as uniformity in the law of maritime contracts and contractual autonomy for sophisticated shippers and carriers — recommend applying COGSA here. *See Kirby*, 543 U.S. at 29. These policies notwithstanding, according to the statutory language and our holding in *Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.*, 213 F.3d 1118 (9th Cir. 2000),

---

[6]We reject Plaintiffs' claim that Carmack should automatically apply under the law of the case doctrine because the district court originally denied UPRR's motion to transfer venue by applying Carmack. The district court clarified in a later order that Carmack's venue limiting provision did *not* apply. Even if it had not, the district court's earlier decision would not bind our reasoning under the law of the case doctrine, which generally precludes courts "from reconsidering an issue that has already been decided *by the same court, or a higher court* in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (emphasis added). We also reject Plaintiffs' assertion that UPRR conceded Carmack's applicability in its motion to remove the proceedings to federal court. The motion's statement that "[t]he first cause of action in the [complaint] . . . contains the elements required to plead a claim against UPRR under the Carmack Amendment," was not a concession that Carmack applies, but instead simply an argument that federal question jurisdiction was appropriate.

Carmack supplies the default regime governing the inland rail shipment here. We therefore hold that COGSA applies only if the parties properly opted out of Carmack.

## A.

**[1]** Before we turn to Defendants' joint arguments, we reject the K-line defendants' threshold assertion that Carmack cannot apply to ocean carriers and their agents. To support their argument, however, K-line and KAM quote selectively from Carmack. By its terms, Carmack applies to "[a] rail carrier providing transportation or service subject to the jurisdiction of the Board under this part," 49 U.S.C. § 11706(a), where a "rail carrier" is "a person providing common carrier railroad transportation for compensation." 49 U.S.C. § 10102(5). Critically, the statute goes on to define "railroad" as including "a bridge, car float, lighter, ferry, *and intermodal equipment used by or in connection with a railroad*." 49 U.S.C. 10102(6)(A) (emphasis added). Moreover, the Board's jurisdiction, which is coextensive with Carmack's coverage, includes "transportation that is by railroad and water, *when the transportation is under common control, management, or arrangement for a continuous carriage or shipment*." 49 U.S.C. § 10501(a)(1)(B) (emphasis added). Here, K-line shipped the cargo from China to the Port of Long Beach on K-line's ocean liner, issued bills of lading that covered the cargo from its place of origin to the final destinations in the United States and contracted with UPRR to ship the cargo from the Port of Long Beach to the Midwest through its agent KAM, who acted on K-line's behalf in receiving its vessel and providing for the inland transport. The K-line defendants therefore provided "continuous carriage or shipment" that was "by railroad and water" via "intermodal equipment used by or in connection with a railroad." As a result, Carmack applies to K-line and its agent.

Applying Carmack to K-line is also consistent with the purpose of Carmack's liability regime, which is "to relieve ship-

pers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling . . . goods." *Reider v. Thompson*, 339 U.S. 113, 119 (1950). Because Plaintiffs dealt directly with K-line to arrange a shipment that included domestic rail carriage, we uphold Carmack's objectives by applying the statute to K-line and its agent.

**[2]** Few opinions have squarely addressed the potential application of Carmack to ocean carriers and their agents and no Supreme Court or Ninth Circuit precedent appears to address this issue. Nevertheless, most of the limited federal jurisprudence on this question either states that Carmack applies to an ocean carrier and its agent or implicitly suggests that it could. *See United States v. Miss. Valley Barge Line Co.*, 285 F.2d 381, 391-94 (8th Cir. 1960) (Blackmun, J.) (holding that Carmack applied to a water carrier that was the contracting carrier when there was a common arrangement as indicated by a through bill of lading); *Kyodo USA Inc. v Cosco N. Am. Inc.*, No. 01-CV-499, 2001 WL 1835158, at *3-5 (C.D. Cal. July 23, 2001) (holding that Carmack could apply to an ocean carrier); *Canon USA Inc. v. Nippon Liner System, Ltd.*, No. 90 C 7350, 1992 WL 82509, at *5-8 (N.D. Ill. April 17, 1992) (applying Carmack to an ocean carrier); *Nelson v. Agwilines*, 70 F.Supp. 497, 500 (S.D.N.Y. 1946) (noting that although "[o]rdinarily a carrier that is wholly a carrier by water is not subject to regulation by [the Board,] [m]any carriers by water have through bill of lading arrangements with railroads, which make the carriers by water subject to regulation by [the Board]"). Until recently, only two authorities, neither of which we find persuasive, explicitly held that Carmack does not apply to an ocean carrier: a decision from the Florida Supreme Court and a subsequent decision from the Federal District Court for the Southern District of Florida that relied on the previous state court decision. *See King Ocean Cent. Am., S.A. v. Precision Cutting Servs., Inc.*, 717 So. 2d 507, 513 (Fla. 1998) (holding that "an ocean carrier's liability was not contemplated or covered under the Car-

mack Amendment"); *PT Indonesia Epson Indus. v. Orient Overseas Container Line, Inc.*, 219 F. Supp. 2d 1265, 1269 (S.D. Fla. 2002) (following *King Ocean*'s analysis and determining that "the Carmack Amendment does not necessarily apply to the through bill of lading issued by [the ocean carrier]"); *contra, Kyodo*, 2001 WL 1835158 at *4 (unpublished district court opinion in this circuit explicitly refusing to endorse *King Ocean*'s analysis).

Since this case was argued, however, the Second Circuit has construed Carmack's definition of a "rail carrier" not to reach two categories of common carriers: (1) an entity "that merely arranges" for goods to be transported by sea and then transferred to a railroad for inland transport, but never itself actually moves the goods; and (2) a common carrier, such as an ocean carrier, that does not conduct rail services nor " 'hold out' that service to the public." *Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.*, 547 F.3d 351, 362, 364 (2d Cir. 2008). K-line and KAM urge us to follow *Rexroth* and exempt them as well. We do not read *Rexroth* so broadly, and in any event decline to apply its limitation of Carmack to the intermodal transport arrangement here.

In *Rexroth*, the plaintiff shippers contracted with a non-vessel-operating common carrier ("NVOCC") that acted as a middleman, arranging for ocean and inland rail carriage "from receipt to delivery." *Id.* at 356. As the term implies, the NVOCC provided no services on any vessel it owned nor did it otherwise physically handle the shipment itself. *See id.* at 361-62. Instead the NVOCC subcontracted with "an ocean carrier that provide[d] the ocean passage," who in turn subcontracted through its American agent to "arrange[ ] rail carriage for the inland leg." *Id.* at 356. Nearly all the Second Circuit's reasoning addressed this middleman, emphasizing that an entity without "any contact with the shipped goods or any performance in the carrying of those goods" merely arranges for railroad transportation and therefore does not *provide* transportation as required for Carmack liability. *Id.* at

361-62. Even if we were to accept this reasoning, it would not apply to K-line's arrangement because there was no middle-man between K-line and Plaintiffs. Rather, Plaintiffs dealt directly with K-line, who actually transported the cargo on its ocean liner and had sustained contact with the shipped goods.

*Rexroth* also summarily excluded the ocean carrier defendant whose services were most analogous to those K-line provided here, saying that the ocean carrier did "not own or operate rail lines or other equipment *used in connection with a railroad.*" *Id.* at 363 (emphasis added). The Second Circuit did not address the statutory definition of railroad transportation we have discussed above, but instead simply concluded without factual explanation that the ocean carrier neither conducted nor held itself out as conducting railroad transportation. *See id.* at 364. Thus we do not know the nature or substance of the ocean carrier's direct interactions, if any, with the shipper. We do know that here, K-line held itself out to the public and contracted with Plaintiffs to transport their goods all the way from China to their inland destinations — by sea utilizing K-line's vessel and by rail utilizing UPRR. In so doing, K-line and its agent, KAM, engaged in railroad transportation subject to the Board's jurisdiction by providing Plaintiffs with continuous carriage by water and rail, utilizing intermodal equipment in connection with a railroad. *See* 49 U.S.C. §§ 10102(6)(A), 10501(a)(1)(B).

[3] In sum, we do not read *Rexroth* to categorically exclude ocean carriers from Carmack liability. The plain language of the statute and a careful application of the Second Circuit's reasoning support our conclusion that K-line and KAM provided railroad transportation covered by Carmack.[7] We there-

---

[7]The Second Circuit also seemed to suggest that because ocean carriers fall under the jurisdiction of the Federal Maritime Commission ("FMC"), they cannot also be regulated by the Board. *See Rexroth*, 547 F.3d at 357. The FMC has jurisdiction to "regulate ocean shipping lines operating between the United States and foreign countries," "monitor[ ] agreements

fore hold that Carmack applies to ocean carriers and their agents under the circumstances here.

**B.**

**[4]** Defendants jointly argue that Carmack cannot apply to a shipment from a foreign country into the United States under a through bill of lading, and therefore the parties' contractual extension of COGSA, with its more liberal rules regarding venue, should control here. In support of their argument, Defendants highlight that four circuits have held that "the Carmack Amendment does not apply to a shipment from a foreign country to the United States (including an ocean leg and overland leg to the final destination in the United States) *unless the domestic overland leg is covered by a separate bill of lading.*" *Altadis USA, Inc. ex. rel. Fireman's Fund Ins. Co. v. Star Line, LLC,* 458 F.3d 1288, 1291 (11th Cir. 2006) (emphasis added); *see Am. Road Serv. Co. v. Consol. Rail Corp.*, 348 F.3d 565, 569 (6th Cir. 2003); *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 703 (4th Cir. 1993); *Capital Converting Equip., Inc. v. LEP Transport, Inc.*, 965 F.2d 391, 394 (7th Cir. 1992); *but see Sompo I*, 456 F.3d at 57, 60-69 (holding that Carmack applies to the domestic rail portion of a continuous intermodal shipment originating in a foreign country even where the transport was under a single through bill of lading that incorporated COGSA beyond the tackle-to-tackle phase). Despite this weight of authority, our own precedent expressly forecloses Defendants' argument in this circuit. In *Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.*, 213 F.3d 1118, 1119 (9th Cir. 2000), we held that "the language of [Carmack] also encompasses the inland leg of an

---

between ocean common carriers" and "enforc[e] a number of prohibitions against discriminatory and unreasonable rates and practices." *Transpacific Westbound Rate Agreement v. Fed. Maritime Comm'n*, 951 F.2d 950, 951 (9th Cir. 1991). Nothing in the FMC's jurisdictional statute makes its jurisdiction exclusive. *See* 46 U.S.C. § 40301.

overseas shipment conducted under a single 'through' bill of lading . . . ." *See Nippon Yusen Kaisha v. Burlington & N. Santa Fe Ry. Co.*, 367 F. Supp. 2d 1292, 1298 n.4 (C.D. Cal. 2005); *Chubb Group of Ins. Companies v. H.A. Transp. Systems, Inc.*, 243 F. Supp. 2d 1064, 1068 n.3 (C.D. Cal. 2002).[8]

Contrary holdings in the Fourth, Sixth, Seventh and Eleventh Circuits rest on the notion that the Board lacks jurisdiction over intermodal shipments into the United States from a point in a foreign country under a through bill of lading. *See, e.g., Am. Road Servs. Co.*, 348 F.3d at 568 ("The [Board]'s jurisdiction does not extend to a shipment under a through bill of lading unless a domestic segment of the shipment is covered by a separate bill of lading."). The Second Circuit has disagreed, holding that a plain reading of the Board's jurisdictional statute applies Carmack to any rail transportation in the United States, even if it originated in a foreign country under a through bill of lading. *See Sompo I*, 456 F.3d at 64. As we noted above, Carmack's reach is coextensive with the Board's jurisdiction, *see* 49 U.S.C. § 11706(a); therefore our conclusions regarding the extent of the Board's jurisdiction, expressed in *Neptune*, determine Carmack's reach as well. Crucially, *Neptune* interpreted our precedent and Carmack's language to apply to "shipments to or from overseas ports" without any requirement for a separate domestic bill of lading for the inland carriage. *Neptune*, 213 F.3d at 1119 (citing *F.J. McCarty Co. v. S. Pac. Co.*, 428 F.2d 690, 692 (9th Cir. 1970)).

**[5]** Defendants' attempt to relegate *Neptune*'s interpretation of Carmack to the status of dictum is unavailing. There is no indication that *Neptune* "did not make a deliberate decision to

---

[8]Although some district courts within the Ninth Circuit have held that the Carmack Amendment did not apply when the cargo at issue was shipped pursuant to a single through bill of lading, these opinions predate *Neptune*. *See, e.g.*, *Tokio Marine & Fire Ins. Co., Ltd. v. Kaisha*, 25 F. Supp. 2d 1071, 1081 (C.D. Cal. 1997).

adopt the rule of law it announced." *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001). Consequently, the absence of a separate bill of lading does not remove this shipment from Carmack's venue restrictions.

## C.

Defendants next argue that even if the Carmack Amendment *could* apply to the inland leg of an international transport conducted under a single through bill of lading, here the parties' explicit contractual extension of COGSA inland should take precedence. Given COGSA's statutory language, *Neptune*'s holding is fatal to this argument. *Neptune*'s import becomes clear when analyzed in light of the distinctions and interactions between three sections of COGSA, currently codified at 46 U.S.C. § 30701 Notes Sec. 7, 12 & 13.[9] In relevant part, the text of these sections is as follows:

- **Section 7**: Nothing contained in this chapter [this note] shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea. 46 U.S.C. § 30701 Notes Sec. 7.

- **Section 12**: Nothing in this chapter [this note] shall be construed as superseding any part of [the Harter Act] *or of any other law which would be applicable in the absence of this chapter* [this note], insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after

---

[9]Previously §§ 1307, 1311 and 1312, respectively.

the time they are discharged from the ship. 46 U.S.C. § 30701 Notes Sec. 12 (emphasis added).

- **Section 13**: This chapter [this note] shall apply to all contract for carriage of goods by sea to or from ports of the United States in foreign trade . . . . The term 'foreign trade' means the transportation of goods between the ports of the United States and ports of foreign countries. Nothing in this chapter [this note] shall be held to apply to contracts for carriage of goods by sea between any port of the United States or its possessions, and any other port of the United States or its possession: *Provided, however,* That any bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea between such ports, containing an express statement that it shall be subject to the provisions of this chapter [this note], shall be subjected hereto as fully as if subject hereto by the express provisions of this chapter [this note]. 46 U.S.C. § 30701 Notes Sec. 13.

Reading these three sections together reveals two interrelated reasons why the contractual extension of COGSA to the inland leg of an intermodal, international transport cannot supersede the requirements imposed by Carmack.

**[6]** First, although Section 7 "confirms that nothing *in COGSA* constrains the parties" from contractually extending COGSA's protections beyond the tackle-to-tackle period, it "leav[es] open the possibility that *something else* might constrain them." Michael F. Sturley, *Freedom of Contract and the Ironic Story of Section 7 of the Carriage of Goods by Sea Act*, 4 BENEDICT'S MARITIME BULL. 201, 203 (Third/Fourth Quarter 2006) (emphasis added) [hereinafter *Freedom of Contract*]. Section 12 "completes the story that Section 7 merely begins," by explicitly confirming that this contractual auton-

omy is constrained by the presence of any other law that would govern the parties before loading or after discharge. *Id.* at 203. In light of *Neptune*, the Carmack Amendment is just such an "other law" to which Section 12 mandates that the contractual inland extension of COGSA must yield. *See Sompo I*, 456 F.3d at 72-73 (relying in part on Section 12 to "hold that the contractual provision extending COGSA's terms inland must yield to Carmack").[10]

**[7]** Second, Section 13's language has an important negative implication for our interpretation of the legal force of a contractual extension of COGSA under Section 7. *See id.* at 70. Through Section 13, "Congress explicitly provided that contracts extending [COGSA's] reach in ways other than over land — in particular, contractual extensions covering trade between United States ports (or 'coastwide trade') — do have statutory force" and can "supersede prevailing federal statutes." *Id.* at 69-70.[11] Congress did not include any comparable language with respect to a contractual extension of COGSA to inland transport under Section 7, simply stating that nothing within COGSA prevents parties from doing so. " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Camacho v. Bridgeport Fin. Inc.*, 430 F.3d 1078, 1081 (9th Cir. 2005) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). "There-

---

[10]The congressional debates about COGSA reflect a similar understanding. As Senator White explained, "[t]he legislation supersedes the so-called 'Harter Act' from the time the goods are loaded on the ship to the time they are discharged from the ship. *Otherwise our law remains precisely as it is, unaffected and unimpaired by the proposed legislation.*" 1 THE LEGISLATIVE HISTORY OF THE CARRIAGE OF GOODS BY SEA ACT AND THE TRAVAUX PRÉPARATOIRES OF THE HAGUE RULES 589 (Michael F. Sturley ed. 1990) (emphasis added).

[11]In the absence of such an extension, another federal statute, the Harter Act, applies to shipments between domestic ports. *See Sompo I*, 456 F.3d at 69 n.15.

fore, that Congress, in enacting [Section 7], omitted language similar to the language in [Section 13] is persuasive evidence that Congress did not wish for period of responsibility clauses [adopted under Section 7] to have the force of statute with the capability to supersede federal law." *Sompo I*, 456 F.3d at 71; *see Freedom of Contract* at 204 (noting this textual distinction "is compelling evidence that indirectly confirms what Section 12 says directly — that Section 7 was not intended to permit a private contract to override otherwise applicable law").[12]

[8] Read together, these provisions make clear that "contracts extending COGSA beyond the tackles must give way to conflicting law." *Sompo I*, 456 F.3d at 71.[13] Per *Neptune*, Car-

---

[12]The Second Circuit recently reaffirmed this core holding of *Sompo I*. *See Rexroth*, 2008 WL 4810069, at *3 ("It is clear from *Sompo* that a 'contractual provision extending COGSA's terms inland must yield to Carmack' if Carmack is applicable.") (quoting *Sompo I*, 456 F.3d at 73).

[13]We briefly distinguish earlier decisions containing general statements that the contractual extension of COGSA could supersede other statutes. *See Starrag v. Maersk, Inc.*, 486 F.3d 607, 615 (9th Cir. 2007); *Sea-Land Serv., Inc. v. Lozen Int'l, L.L.C.*, 285 F.3d 808, 817 (9th Cir. 2002); *N. River Ins. Co. v. Fed Sea/Fed Pac Line*, 647 F.2d 985, 987 (9th Cir. 1981). First, none of these cases addressed a potential conflict between COGSA and Carmack. Second, the original source for all of these statements is *Pan Am. World Airways, Inc. v. Cal. Stevedores & Ballast Co.*, 559 F.2d 1173 (9th Cir. 1977). *See N. River*, 647 F.2d at 987 (citing *Pan Am.*); *Sea-Land*, 285 F.3d at 817 (citing *N. River*); *Starrag*, 486 F.3d at 615 (citing *Sea-Land*). Importantly, *Pan American* addressed "a contract for carriage between a port in the continental United States and a port in a United States possession." 559 F.2d at 1175 n.3. In other words, *Pan American* dealt with an extension of COGSA over coastwide trade, and therefore triggered Section 13's explicit mandate that such extensions should apply "as fully as if subject [hereto] by the express provisions of [COGSA]." *Id.* (quoting 46 U.S.C. § 1312). Its holding therefore has no bearing on the legal weight that should be afforded to inland contractual extensions of COGSA under Section 7. *See N. River*, 647 F.2d at 988-89 (noting this distinction). Finally, none of these opinions ultimately relied on their statements that the contractual extension of COGSA could supersede a federal statute in order to reach their holding. *See Starrag*, 486 F.3d at 615 (noting that "where the parties contractually extend the COGSA to cover the dam-

mack is a conflicting law here. Although, as we have discussed, the Eleventh Circuit has allowed the contractual extension of COGSA inland, that court disagrees with ours about the reach of Carmack where the parties have used a through bill of lading. *Compare Neptune*, 213 F.3d at 1119 ("The language of [Carmack] also encompasses the inland leg of an overseas shipment conducted under a single 'through' bill of lading . . . .") *with Altadis*, 458 F.3d at 1291 ("The case law has established that the Carmack Amendment does not apply to a shipment from a foreign country to the United States . . . unless the domestic, overland leg is covered by a separate bill of lading."). Because here Carmack is federal law conflicting with the parties' contractual extension of COGSA, we cannot follow the Eleventh Circuit by validating COGSA's inland reach.

Defendants argue that policy considerations of contractual autonomy, efficiency and uniformity of maritime liability rules weigh in favor of allowing shippers and carriers to extend COGSA inland. The Supreme Court recently endorsed these policy objectives by emphasizing that "[c]onfusion and inefficiency will inevitably result if more than one body of law governs a given contract's meaning." *Kirby*, 543 U.S. at 29. The unanimous Court in *Kirby* further observed that an

---

age, the Harter Act does not apply," but ultimately concluding that "even if the Harter Act applied," it would not prohibit the challenged limited liability clause); *Sea-Land*, 285 F.3d at 817 (noting that "because COGSA is incorporated by contract into Sea-Land's bills of lading, 'it, rather than the Harter Act, controls,' " but only after it had already concluded that the Harter Act did not apply to the case at bar in the first place); *N. River*, 647 F.2d at 987, 989 (noting that "[w]hen COGSA is incorporated by contract, it, rather than the Harter Act, controls" within the context of a case that ultimately turned on the interaction between the contractual extension of COGSA and another *contractual* term). "[W]e are not bound by a holding . . . 'where it is merely a prelude to another legal issue that commands the panel's full attention . . . .' " *V.S. ex rel. A.O. v. Los Gatos-Saratoga Joint Union High Sch. Dist.*, 484 F.3d 1230, 1232 n.1 (9th Cir. 2007) (quoting *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001)).

inability to extend COGSA's default rules to inland transport, so that entire shipments could be governed by the same liability regime, would defeat "the apparent purpose of COGSA[ ] to facilitate efficient contracting in contracts for carriage by sea." *Id.*; *see Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 419 (6th Cir. 2008) ("*Kirby*'s reasoning affirms the broader principle that courts should evaluate maritime contracts in their entirety rather than treating each of the multiple stages in multimodal transportation as subject to separate legal regimes, which would be an obstacle to uniform and efficient liability rules."). Ignoring a contractual provision incorporating COGSA seems particularly inappropriate where, as here, "the parties to the bill of lading were sophisticated business entities that should rarely be released from contractual obligations." Raymond T. Waid, Comment, *Piloting in Post-*Kirby *Waters: Navigating the Circuit Split Over Whether the Carmack Amendment Applies to the Land Leg of an Intermodal Carriage of Goods on a Through Bill of Lading*, 34 TRANSP. L.J. 113, 143 (Summer 2007).

**[9]** Nonetheless, and mindful of these policy considerations, *Kirby* does not control here. There, the Court held that *state* law did not apply to a bill of lading that extended COGSA inland, where COGSA and the state law conflicted. *Kirby*, 543 U.S. at 28-29. Focusing as it did on the need for state law to yield to federal law in the maritime context, the Court did not have occasion to consider which of two conflicting federal laws should govern a maritime shipment with an inland leg. *See Sompo I*, 456 F.3d at 75 ("We cannot interpret the *Kirby* Court's language concerning the policy underlying COGSA . . . as implying that a contract extending COGSA inland should supersede an otherwise applicable *federal* law."). The policy of uniformity in maritime shipping, however compelling, must give way to controlling statutes and precedent. Given *Neptune*'s holding that Carmack applies and the conspicuous absence in COGSA of language allowing parties to give superseding statutory force to their contractual

extensions of COGSA inland under Section 7, we hold that a mere contractual extension of COGSA is not alone sufficient to overcome Carmack.

Nevertheless, Carmack — including its restrictive venue provisions — is merely a set of default rules. To the extent Carmack sanctions alternative provisions, a properly adopted alternative forum selection clause would eliminate Carmack as a conflicting "other law" superseding the parties' contractual extension of COGSA. *Neptune* did not reach this issue and does not hold otherwise. Such a contractual alteration cannot come from COGSA's Section 7, as explained above, because Section 7 does not give such contracts statutory force. But Carmack itself does contain two provisions for avoiding the statutory defaults: 49 U.S.C. §§ 10502 & 10709. We next turn to these two possible Carmack opt-outs.

### III.   Contracting for Alternative Terms under Carmack

As discussed, whereas COGSA would allow a reasonable alternative forum selection clause, Carmack strictly limits the venues in which a party can bring a claim. *See* 49 U.S.C. § 11706(d)(2)(A). In this case, Tokyo does not fit into any of the categories to qualify as an acceptable forum under Carmack. *See Regal-Beloit*, 462 F. Supp. 2d at 1103.[14] Accordingly, the Tokyo forum selection clause's enforceability turns on whether the parties complied with the applicable requirements for opting out of Carmack.

Congress created two different mechanisms — § 10502 and § 10709 — by which some rail services may be exempted from certain requirements usually imposed by Carmack. These dual provisions require us to resolve whether the parties entered into a § 10502 or a § 10709 contract and, relat-

---

[14]We agree with the district court's conclusion that "[i]f applicable, the Carmack Amendment would limit venue in this case to California, Oklahoma, or Wisconsin." *Regal-Beloit*, 462 F. Supp. 2d at 1103.

edly, what each provision requires for avoiding Carmack. We conclude that § 10502 is the only proviso the parties here could have followed to contract out of Carmack's venue restrictions. Because the district court instead analyzed the contracts under § 10709, we remand for an application of § 10502, whose requirements we clarify below.

## A.

**[10]** Once again, we preface our analysis by looking to the relevant statutory language. Section 10502(f) authorizes the Board to exempt from Carmack "transportation that is provided by a rail carrier as part of a continuous intermodal movement." Here, "rail carrier" is subject to the same "Definitions" section we applied above to conclude that even an ocean carrier like K-line is a rail carrier when contracting to provide inland rail transportation. *See* 49 U.S.C. § 10102 (providing definitions for "this part").**[15]** Thus, K-line is a rail carrier for purposes of determining whether it provides transportation that is exempt under the Board's § 10502 authority. It is undisputed that the Board has exempted the transportation at issue here. *See* 49 C.F.R. § 1090.2 ("[R]ail TOFC/COFC service and highway TOFC/COFC service provided by a rail carrier either itself or jointly with a motor carrier as part of a continuous intermodal freight movement is exempt from the requirements of 49 U.S.C. subtitle IV . . . .").**[16]**

The Board's action relieves carriers providing such *exempt* transportation from certain regulatory burdens, such as rate regulation. *See, e.g.*, 49 U.S.C. § 10701. Carmack's liability and venue rules are not so plainly waived, however. The statute mandates that "[n]o exemption order issued pursuant to this section shall operate to relieve any rail carrier from an

---

**[15]** Specifically, " '[t]his part' refers to 49 U.S.C. Subtitle IV, Part A, which includes Carmack." *Sompo II*, 540 F. Supp. 2d at 494.

**[16]** These acronyms respectively refer to "trailer on flatcar" and "container on flatcar" service.

obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11706 of this title." 49 U.S.C. § 10502(e). Nonetheless, § 10502(e) also provides that carriers and shippers thus exempted are not unalterably bound by the liability and venue restrictions in Carmack's § 11706, because "[n]othing in this subsection or section 11706 of this title shall prevent rail carriers from offering alternative terms. . . ." *Id.* These two clauses of § 10502(e) are not inconsistent: carriers providing exempt transportation are obliged to provide terms consistent with Carmack's venue and liability protections to their shipper customers, but are ultimately free to contract under terms different from those in § 11706. Courts have concluded that the "combined effect" of § 10502 and § 11706 is to permit carriers providing exempt transportation to contract for terms that are different from Carmack's defaults so long as they first offer the shipper the option of full Carmack protections, presumably at a higher rate. *See Sompo I*, 456 F.3d at 60 (collecting authority). If the carrier fails to make this initial offer, however, "then the shipper may sue the carrier under Carmack." *Id.*[17]

On the other hand, avoiding Carmack's default rules under § 10709 is simpler: "[o]ne or more rail carriers providing transportation *subject to the jurisdiction of the Board* . . . may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions." 49 U.S.C. § 10709(a) (emphasis added). Under such an agreement for *nonexempt* transportation, carriers "have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract." 49 U.S.C. § 10709(b). Moreover, "[a] contract that is authorized by this section, and transportation under such contract, shall not be subject to *this part*, and may not

---

[17]The Second Circuit's recent limitation of *Sompo I* in *Rexroth*, 2008 WL 4810069, at n.15, discussed *Sompo I*'s interpretation of § 10502 with approval.

be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part," 49 U.S.C. § 10709(c)(1) (emphasis added) — "this part" encompassing the Carmack Amendment.

[11] The terms of these two different provisions evidence a clear distinction between § 10502 contracts and § 10709 contracts. The distinction is based on whether the transportation at issue in the contract is exempt from Board regulation. Whereas § 10502 requires carriers providing *exempt* transportation to offer Carmack protections before they can successfully contract for alternative terms, § 10709 contains no such language — indeed, it explicitly contemplates that *nonexempt* carriers' contracts alone control. Defendants argued successfully before the district court that they entered into a § 10709 contract with Plaintiffs, and thus were not required to offer Carmack protections as a prerequisite for their extension of COGSA to the inland segment of the transport. Defendants point to the MITA, which was incorporated by the ERTA and explicitly states "[t]his MITA and any agreements, price documents or contracts that reference this MITA have been made under 49 U.S.C. § 10709." Plaintiffs argue on appeal that Defendants could not have entered into even a legitimate § 10709 contract without first offering full Carmack protections.[18] We disagree with both parties' reasoning. Plaintiffs

---

[18]Although Plaintiffs did not explicitly raise this argument in their opposition to the motion to dismiss, we exercise our discretion to address it here. *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 912 (9th Cir. 1995). Plaintiffs had no reason to address the potential inapplicability of § 10709 below because this was not raised by Defendants in their motions to dismiss, which instead were limited to the assertion that COGSA, rather than Carmack, should govern. Defendants only added that they were exempt from the Carmack's requirements under § 10709 in their reply briefs. It is unreasonable to require Plaintiffs to argue that a particular provision did not apply before Defendants even suggested that this provision authorized their contracts. Reaching the argument is appropriate because this issue presents a purely legal question, *see id.*, and Defendants will not be prejudiced, as they have fully briefed this issue on the merits, *see United States v. Fonseca-Caro*, 114 F.3d 906, 907 n.2 (9th Cir. 1997) (per curiam).

are incorrect that § 10709 requires offering Carmack protections. *See Sompo II*, 540 F. Supp. 2d at 494 (collecting district court cases); *but see id.* at 495-98 (discussing cases that "have varied wildly" on this issue). In any event, Defendants are mistaken that simply asserting in a contract that it was made under § 10709 makes it so. The contract here had to be a § 10502 contract because it concerned *exempt* transportation, and must therefore be analyzed on remand under the requirements of that section.

**B.**

The parties' confusion is understandable given the "muddled state of the law." *Sompo II*, 540 F. Supp. 2d at 498 & n.8 (citing "[s]everal courts [that] have noted that this issue has not been adequately addressed"). Congress has not provided any guidance regarding how to read § 10502 and § 10709 in tandem, and very few courts have squarely confronted the question.[19]

We cannot adopt either of the parties' arguments, however, as each would render one of the statutory provisions practically meaningless. Plaintiffs' argument that a carrier can form a § 10709 contract only if it first offers the shipper full Carmack protections essentially converts all § 10709 contracts into § 10502 contracts. *Cf. Sompo II*, 540 F. Supp. 2d at 494 ("Most courts have concluded that [the statutory] language indicates that § 10709 contracts are not subject to Carmack, and need not offer a full Carmack liability option before properly limiting carrier liability."). Defendants' argument, however, effectively nullifies § 10502 because it would allow any

---

[19]The parties have therefore been forced to rely on unpublished district court decisions to support their respective arguments. *See Tamini Transformatori S.R.L. v. Union Pac. R.R.*, No. 02 Civ. 129, 2003 WL 135722 (S.D.N.Y. Jan. 17, 2003) (supporting Plaintiffs' argument); *Tokio Marine & Fire Ins. Co. v. Mitsui O.S.K. Lines, Ltd.,* No. CV 02-3617, 2003 WL 23181013 (C.D. Cal. June 27, 2003) (supporting Defendants' argument).

carrier — even those exempted under § 10502 — to avoid § 10502's prerequisites simply by stating that its contract was pursuant to § 10709.[20] It would be "nonsensical for . . . § 10502 to permit a certain category of rail contracts to offer specific rates and terms but require an initial offer of full Carmack liability and . . . § 10709 to permit the *same category of rail contracts* to offer specific rates and terms with no such requirement of an initial offer of full Carmack liability." *Id.* at 499 (emphasis in original); *see also id.* ("Section 10709 simply cannot be used as a tool to extract contracts governing exempted rail carriers that operate one leg of a continuous intermodal movement from the regulatory demands of § 10502 and Carmack."). When the Board exempted the category of transportation at issue here, the providers of that transportation, including Defendants, gained the benefits of deregulated rates. The Board's exemption removed this transportation "from the requirements of 49 U.S.C. subtitle IV," 49 C.F.R. § 1090.2, which includes the provision setting standards for rates, *see* 49 U.S.C. § 10701. But Subtitle IV also includes § 10709. Consequently, carriers providing exempt transportation gain the benefits of deregulation, but lose the opportunity to contract for preferable terms under § 10709 without first offering Carmack terms.

[12] In keeping with Congress' specification of two distinct methods for carriers to avoid the requirements imposed by Carmack, we therefore hold that a carrier providing nonexempt transportation may contract under § 10709 without offering Carmack protections, but a carrier providing exempt transportation must proceed under § 10502, which does

---

[20]We are particularly troubled by the potential for such an outcome where, as here, the statement that the agreement is governed by § 10709 is buried within several layers of incorporated text, of which the shipper had no direct knowledge. *See Sompo II*, 540 F. Supp. 2d at 500 ("First, it is not clear that the shippers . . . are on actual notice of either the ITAs or the rail carrier circulars or have the opportunity to review them and, second, there are too many steps incorporated by reference to properly charge the shippers with notice of their terms.").

require such an offer. *See Sompo II*, 540 F. Supp. 2d at 499. Accordingly, Defendants here could not have entered into a § 10709 contract notwithstanding the MITA's clause declaring otherwise. Defendants accept that § 10502 covers exempt transportation, but argue that carriers providing exempt transportation could nevertheless still *choose* to contract under § 10709. Our interpretation of the relationship between § 10502 and § 10709 forecloses this argument.[21]

## C.

In sum, § 10502 provides the only method through which these parties *might* have agreed to the Tokyo forum selection clause. To comply with § 10502, K-line needed to offer Carmack's protections when contracting with Plaintiffs. K-line argues that it did so, pointing to a clause in the MITA that reads, "[o]n domestic shipments that originate in the United States, Shippers may, at their option, select the liability provisions set forth in 49 U.S.C. § 11706." We are skeptical that reference to Carmack in connection with shipments originating *in the United States*, appearing in the MITA instead of in the bills of lading, could fulfill § 10502's requirement that Carmack protections be offered. Perhaps more compellingly, K-line points to Clause 5(1) of the bills of lading, which

---

[21]During oral argument, Defendants attempted to elude § 10502's requirements, asserting that: (1) § 10502 applies only to "common carrier" contracts, (2) § 10709 applies only to "private" contracts and (3) the instant contract falls into the latter category. We reject this argument. First, the argument was waived. *See United States v. Kimble,* 107 F.3d 712, 715 n.2 (9th Cir. 1997) (noting that arguments which are "not coherently developed in [the] briefs" are abandoned); *Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992) (noting that "issues raised in a brief which are not supported by argument are deemed abandoned"). Second, this argument appears to have no basis in our case law or statutes. We did not find any authority that distinguishes between § 10709 and § 10502 contracts in the manner Defendants suggest, neither § 10709 nor § 10502 uses the terms "private contract" or "common carrier contract" and neither of these phrases is included in the statute's "definitions." *See* 49 U.S.C. § 10102.

allows K-line to subcontract with rail carriers "on any terms whatsoever." From this, it might be inferred that by making the choice to allow K-line to do all the subcontracting on "any terms whatsoever," Plaintiffs implicitly considered and rejected Carmack terms. Plaintiffs counter that no evidence of an offer of these terms exists and that another part of the MITA seems to preclude Carmack from applying.[22]

It is improper for us, on this record, to decide in the first instance whether the parties' negotiation and acceptance of their numerous, cross-referenced agreements included an offer of Carmack terms or an understanding that Carmack terms were available but were rejected. Section 10502(a) says only that the Carmack terms must be offered, not necessarily that they appear in the written agreement. Thus, on remand, the district court may develop the record with respect to the parties' understanding of whether Carmack terms were on the table when they executed the bills of lading.

---

[22]The parties' disagreement about what was offered in the bills of lading by way of the later provisions of the MITA is unsurprising because the interactions among the bills of lading, the MITA and ERTA are far from clear. Although the MITA purports that "all Shipments are subject to this MITA" regardless of their billing method (including a bill of lading), it also establishes that "this MITA . . . as well as the terms and condition of . . . ocean or rail carrier's Bills of Lading . . . shall constitute the entire contract for transportation between the parties." The terms of the MITA do not make clear, then, whether the MITA's or the bills of lading's terms take precedence in the case of a conflict. This becomes increasingly complex because the ERTA never explicitly incorporated the MITA's *venue* provisions, and it is unclear whether its more general incorporation language would encompass these restrictions. Finally, the MITA establishes that changes *can* be made to its terms *if* they are "approved in writing prior to the issuance of any shipping document," or "through a document signed by a duly authorized manager of UPRR." The record does not indicate whether any such authorization occurred. This factual morass may benefit from further development before the district court on remand.

## Conclusion

**[13]** As a matter of policy, it may be that sophisticated commercial entities should be able to freely decide by contract the liability regime that is to govern the shipment of goods from a foreign country to their ultimate destination in the United States, and do so utilizing a single bill of lading. Nonetheless, given the language of the relevant statutes and our own precedent, we hold that COGSA cannot govern the inland transport at issue here unless the parties opted out of Carmack in accordance with the requirements of 49 U.S.C. § 10502. We further hold that § 10709 cannot apply here given the exempt status of the transportation involved. Because the district court did not consider whether the parties opted out of Carmack's default rules under § 10502, thereby clearing the way for COGSA to apply by contractual extension, we remand for that determination.

**REVERSED and REMANDED.**