*93 Justice Kennedy
delivered the opinion of the Court.
These eases concern through bills of lading covering cargo for the entire course of shipment, beginning in a foreign, overseas country and continuing to a final, inland destination in the United States. The voyage here included ocean transit followed by transfer to a rail carrier in this country. The Court addressed similar factual circumstances in Norfolk Southern R. Co. v. James N. Kirby, Pty Ltd., 543 U. S. 14 (2004). In that case the terms of a through bill were controlled by federal maritime law and by a federal statute known as the Carriage of Goods by Sea Act (COGSA), note following 46 U. S. C. § 30701. Kirby held that bill of lading provisions permissible under COGSA can be invoked by a domestic rail carrier, despite contrary state law.
The instant cases present a question neither raised nor addressed in Kirby. It is whether the terms of a through bill of lading issued abroad by an ocean carrier can apply to the domestic part of the import’s journey by a rail carrier, despite prohibitions or limitations in another federal statute. That statute is known as the Carmack Amendment and it governs the terms of bills of lading issued by domestic rail carriers. 49 U. S. C. § 11706(a).
I
Respondents Regal-Beloit Corporation, Victory Fireworks, Inc., PICC Property & Casualty Company Ltd., and Royal & Sun Alliance Insurance Company Ltd. are cargo owners or insurance firms that paid losses to cargo owners and succeeded to their rights, all referred to as “cargo owners.” To ship their goods from China to inland destinations in the Midwestern United States, the cargo owners delivered the goods in China to petitioners in No. 08-1553, Kawasaki Kisen Kaisha Ltd., and its agent “K” Line America, Inc., both referred to as “K” Line. All agree the relevant contract terms governing the shipment are contained in four *94 through bills of lading “K” Line issued to the cargo owners. The bills of lading covered the entire course of shipment.
The bills required “K” Line to arrange delivery of the goods from China to their final destinations in the United States, by any mode of transportation of “K” Line’s choosing. A bill of lading “records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage.” Kirby, 543 U. S., at 18-19. A through bill of lading covers both the ocean and inland portions of the transport in a single document. Id., at 25-26.
“K” Line’s through bills contain five relevant provisions. First, they include a so-called “Himalaya Clause,” which extends the bills’ defenses and limitations on liability to parties that sign subcontracts to perform services contemplated by the bills. See id., at 20, and n. 2. Second, the bills permit “K” Line “to sub-contract on any terms whatsoever” for the completion of the journey. App. 145. Third, the bills provide that COGSA’s terms govern the entire journey. Fourth, the bills require that any dispute will be governed by Japanese law. Fifth, the bills state that any action relating to the carriage must be brought in “Tokyo District Court in Japan.” Id., at 144. The forum-selection provision in the last clause gives rise to the dispute here.
“K” Line, pursuant to the bills of lading, arranged for the entire journey. It subcontracted with petitioner in No. 08-1554, Union Pacific Railroad Company, for rail shipment in the United States. The goods were to be shipped in a “K” Line vessel to a port in Long Beach, California, and then transferred to Union Pacific for rail carriage to the final destinations.
In March and April 2005, the cargo owners brought four different container shipments to “K” Line vessels in Chinese ports. All parties seem to assume that “K” Line safely transported the cargo across the Pacific Ocean to California. *95 The containers were then loaded onto a Union Pacific train and that train, or some other train operated by Union Pacific, derailed in Tyrone, Oklahoma, allegedly destroying the cargo.
The cargo owners filed four separate lawsuits in the Superior Court of California, County of Los Angeles. The suits named “K” Line and Union Pacific as defendants. Union Pacific removed the suits to the United States District Court for the Central District of California. Union Pacific and “K” Line then moved to dismiss based on the parties’ Tokyo forum-selection clause. The District Court granted the motion to dismiss. It decided that the forum-selection clause was reasonable and applied to Union Pacific pursuant to the Himalaya Clause in “K” Line’s bills of lading. 462 F. Supp. 2d 1098, 1102-1103 (2006).
The United States Court of Appeals for the Ninth Circuit reversed and remanded. 557 F. 3d 985 (2009). The court concluded that the Carmack Amendment applied to the inland portion of an international shipment under a through bill of lading and thus trumped the parties’ forum-selection clause. Id., at 994-995. The court noted that this view was consistent with the position taken by the Court of Appeals for the Second Circuit, see id., at 994 (citing Sompo Japan Ins. Co. of Am. v. Union Pacific R. Co., 456 F. 3d 54 (2006)), but inconsistent with the views of the Courts of Appeals for the Fourth, Sixth, Seventh, and Eleventh Circuits, see 557 F. 3d, at 994 (citing Shao v. Link Cargo (Taiwan) Ltd., 986 F. 2d 700 (CA4 1993); American Road Serv. Co. v. Consolidated Rail Corporation, 348 F. 3d 565 (CA6 2003); Capitol Converting Equip., Inc. v. LEP Transp., Inc., 965 F. 2d 391 (CA7 1992); Altadis USA, Inc., ex rel. Fireman’s Fund Ins. Co. v. Sea Star Line, LLC, 458 F. 3d 1288 (CA11 2006)). This Court granted certiorari to address whether Carmack applies to the inland segment of an overseas import shipment under a through bill of lading. 558 U. S. 969 (2009).
*96 II
A
Before turning to Carmack, a brief description of COGSA is in order; for “K” Line’s and Union Pacific’s primary contention is that COGSA, not Carmack, controls. COGSA governs the terms of bills of lading issued by ocean carriers engaged in foreign trade. 49 Stat. 1207, as amended, note following 46 U. S. C. § 30701, p. 1178. It requires each carrier to issue to the cargo owner a bill that contains certain terms. § § 3(3) — (8), at 1178-1179. Although COGSA imposes some limitations on the parties’ authority to adjust liability, it does not limit the parties’ ability to adopt forum-selection clauses. See Vimar Seguros y Reaseguros, S. A. v. M/V Sky Reefer, 515 U. S. 528, 537-539 (1995). By its terms, COGSA only applies to shipments from United States ports to ports of foreign countries and vice versa. §§ 1(e), 13, at 1178, 1180. The statute, however, allows parties “the option of extending [certain COGSA terms] by contract” to cover “the entire period in which [the goods] would be under [a carrier’s] responsibility, including [a] period of . . . inland transport.” Kirby, 543 U. S., at 29 (citing COGSA §7, at 1180). Ocean carriers, which often must issue COGSA bills of lading, are regulated by the Federal Maritime Commission (Maritime Commission), which is responsible for oversight over “common carriage of goods by water in ... foreign commerce.” 46 U. S. C. § 40101(1).
B
The next statute to consider is the Carmack Amendment, § 7, 34 Stat. 595, which governs the terms of bills of lading issued by domestic rail carriers. Carmack was first enacted in 1906 as an amendment to the Interstate Commerce Act, 24 Stat. 379. The Carmack Amendment has been altered and recodified over the last century. It now provides, in relevant part, as follows:
*97 “(a) A rail carrier providing transportation or service subject to the jurisdiction of the [Surface Transportation Board (STB)] under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the [STB] under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by—
“(1) the receiving rail carrier;
“(2) the delivering rail carrier; or
“(3) another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.
“Failure to issue a receipt or bill of lading does not affect the liability of a rail carrier.” 49 U. S. C. § 11706; see also § 14706(a) (motor carriers).
The Carmack Amendment thus requires a rail carrier that “receives [property] for transportation under this part” to issue a bill of lading. § 11706(a). The provision “this part” refers to is the STB’s jurisdiction over rail transportation within the United States. See § 10501 (2006 ed. and Supp. II). The STB is the successor to the Interstate Commerce Commission. The STB has “exclusive” jurisdiction to regulate “transportation by rail carrier[s]” between places in the United States as well as between a place in “the United States and a place in a foreign country.” §§ 10501(a)(1), (a)(2)(F), (b) (2006 ed.). Regulated rail carriers must provide transportation subject to STB rail carrier jurisdiction “on reasonable request,” § 11101(a), at reasonable rates, §§ 10702, 10707(b), 11101(a), (e).
*98 In cases where it applies, Carmack imposes upon “receiving rail carrier[s]” and “delivering rail carrier[s]” liability for damage caused during the rail route under the bill of lading, regardless of which carrier caused.the damage. § 11706(a). Carmack’s purpose is to relieve cargo owners “of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods.” Reider v. Thompson, 339 U. S. 113, 119 (1950). To help achieve this goal, Carmack constrains carriers’ ability to limit liability by contract. § 11706(c).
Carmack also limits the parties’ ability to choose the venue of their suit:
“(d)(1) A civil action under this section may be brought in a district court of the United States or in a State court.
“(2)(A) A civil action under this section may only be brought—
“(i) against the originating rail carrier, in the judicial district in which the point of origin is located;
“(ii) against the delivering rail carrier, in the judicial district in which the principal place of business of the person bringing the action is located if the delivering carrier operates a railroad or a route through such judicial district, or in the judicial district in which the point of destination is located; and
“(iii) against the carrier alleged to have caused the loss or damage, in the judicial district in which such loss or damage is alleged to have occurred.” § 11706.
For purposes of these cases, it can be assumed that if Car-mack’s terms apply to the bills of lading here, the cargo owners would have a substantial argument that the Tokyo forum-selection clause in the bills is pre-empted by Car-mack’s venue provisions. The parties argue about whether *99 they may contract out of Carmack’s venue provisions and other requirements, see §§ 10502, 10709; but in light of the disposition and ruling to follow, those matters need not be discussed or further explored.
Ill
In Kirby, an ocean shipping company issued a through bill of lading, agreeing to deliver cargo from Australia to Alabama. Like the through bills in the present cases, the Kirby bill extended COGSA’s terms to the inland segment under a Himalaya Clause. There, as here, the property was damaged by a domestic rail carrier during the inland rail portion. 548 U. S., at 19-20.
Kirby held that the through bill’s terms governed under federal maritime law, notwithstanding contrary state laws. Id., at 23-27. Kirby explained that “so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce.” Id., at 27. The Court added that “[ajpplying state law to cases like this one would undermine the uniformity of general maritime law.” Id., at 28. “Confusion and inefficiency will inevitably result if more than one body of law governs a given contract’s meaning.” Id., at 29. The Court noted that its conclusion “reinforce[d] the liability regime Congress established in COGSA,” and explained that COGSA allows parties to extend its terms to an inland portion of a journey under a through bill of lading. Ibid. Finally, the Court concluded that a contrary holding would defeat “the apparent purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea.” Ibid.
Much of what the Court said in Kirby applies to the present cases. “K” Line issued the through bills under COGSA, in maritime commerce. Congress considered such international through bills and decided to permit parties to extend COGSA’s terms to the inland domestic segment of the journey. The cargo owners and “K” Line did exactly that in *100 these cases, agreeing in the through bills to require that any suit be brought in Tokyo.
IV
The cargo owners argue that the Carmack Amendment, which has its own venue provisions and was not discussed in Kirby, requires a different result. In particular they argue that Carmack applies to the domestic inland segment of the carriage here, so the Tokyo forum-selection clause is inapplicable. For the reasons set forth below, this contention must be rejected. Instructed by the text, history, and purposes of Carmack, the Court now holds that the amendment does not apply to a shipment originating overseas under a single through bill of lading. As in Kirby, the terms of the bill govern the parties’ rights.
A
The text of the statute charts the analytic course. Car-mack divides the realm of rail carriers into three parts: (1) receiving rail carriers; -(2) delivering rail carriers; and (3) connecting rail carriers. A “receiving rail carrier” is one that “provid[es] transportation or service ... for property it receives for transportation under this part.” § 11706(a); see § 11706(a)(1). The provision “this part” refers to is the STB’s jurisdiction over rail transportation within the United States. See § 10501. A “delivering rail carrier” “delivers the property and is providing transportation or service subject to the jurisdiction of the [STB] under this part.” § 11706(a); see § 11706(a)(2). A connecting rail carrier is “another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.” § 11706(a)(3).
A rail carrier’s obligation to issue a Carmack-compliant bill of lading is determined by Carmack’s first sentence:
“A rail carrier providing transportation or service subject to the jurisdiction of the [STB] under this part *101 shall issue a receipt or bill of lading for property it receives for transportation under this part.” § 11706(a).
This critical first sentence requires a Carmack-compliant bill of lading if two conditions are satisfied. First, the rail carrier must “provid[e] transportation or service subject to the jurisdiction of the [STB].” Second, that carrier must “reeeiv[e]” the property “for transportation under this part,” where “this part” is the STB’s jurisdiction over domestic rail transport. Carmack thus requires the receiving rail carrier — but not the delivering or connecting rail carrier — to issue a bill of lading. As explained below, ascertaining the shipment’s point of origin is critical to deciding whether the shipment includes a receiving rail carrier.
The conclusion that Carmack’s bill of lading requirement only applies to the receiving rail carrier is dictated by the text and is consistent with this Court’s precedent. See St. Louis, I. M. & S. R. Co. v. Starbird, 248 U. S. 592, 604 (1917) (explaining that Carmack “requires the receiving carrier to issue a through bill of lading”). A receiving rail carrier is the initial carrier, which “receives” the property for domestic rail transportation at the journey’s point of origin. § 11706(a). If Carmack’s bill of lading requirement did not refer to the initial carrier, but rather to any rail carrier that in the colloquial sense “received” the property from another carrier, then every carrier during the shipment would have to issue its own separate bill. This would be altogether contrary to Carmack’s purpose of making the receiving and delivering carriers liable under a single, initial bill of lading for damage caused by any carrier within a single course of shipment.
This Court’s decision in Mexican Light & Power Co. v. Texas Mexican R. Co., 331 U. S. 731 (1947), supports the conclusion that only the receiving rail carrier must issue a Car-mack bill of lading. There, a subsequent rail carrier in an export shipment from the United States to Mexico issued its own separate bill of lading at the U. S.-Mexico border. The *102 second bill differed from the through bill issued by the “initial carrier,” id., at 783, (that is, the receiving carrier) at the inland point of origin. The Court held that Carmack, far from requiring nonreceiving carriers to issue their separate bills of lading, makes any subsequent bill “void” unless the “so-called second bill of lading represents the initiation of a new shipment.” Id., at 734.
The Court’s decision in Reider, 339 U. S. 113, is not to the contrary. That case involved goods originating in Argentina, bound for an inland location in the United States. The Court in Reider determined that because there was no through bill of lading, the original journey from Argentina terminated at the port of New Orleans. Thus, the first rail carrier in the United States was the receiving rail carrier and had to issue a Carmack bill of lading. Id., at 117. And because that carrier had to issue a separate bill of lading, it was not liable for damage done during the ocean-based portion of the shipment. Id., at 118-119. Notably, neither Mexican Light nor Reider addressed the situation in the present cases, where the shipment originates overseas under a through bill of lading. And, for this reason, neither case discussed COGSA.
The Carmack Amendment’s second sentence establishes when Carmack liability applies:
“[The receiving rail carrier referred to in the first sentence] and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the [STB] under this part are liable to the person entitled to recover under the receipt or bill of lading.” § 11706(a).
Thus, the receiving and delivering rail carriers are subject to liability only when damage is done to this “property,” that is to say, to property for which Carmack’s first sentence requires the receiving rail carrier to issue a bill of lading. Ibid. Put another way, Carmack applies only to transport *103 of property for which. Carmack requires a receiving carrier to issue a bill of lading, regardless of whether that carrier erroneously fails to issue such a bill. See ibid. (“Failure to issue a receipt or bill of lading does not affect the liability of a rail carrier”). The language in some of the Courts of Appeals’ decisions, which were rejected by the Court of Appeals in the opinion now under review, could be read to imply that Carmack applies only if a rail carrier actually issued a separate domestic bill of lading. See, e. g., Altadis, 458 F. 3d, at 1291-1294; American Road, 348 F. 3d, at 568; Shao, 986 F. 2d, at 703; Capitol Converting, 965 F. 2d, at 394. This may have led to some confusion. The decisive question is not whether the rail carrier in fact issued a Carmack bill but rather whether that carrier was required to issue a bill by Carmack’s first sentence.
The above principles establish that for Carmack’s provisions to apply the journey must begin with a receiving rail carrier, which would have to issue a Carmack-compliant bill of lading. It follows that Carmack does not apply if the property is received at an overseas location under a through bill that covers the transport into an inland location in the United States. In such a case, there is no receiving rail carrier that “receives” the property “for [domestic rail] transportation,” § 11706(a), and thus no carrier that must issue a Carmack-compliant bill of lading. The initial carrier in that instance receives the property at the shipment’s point of origin for overseas multimodal import transport, not for domestic rail transport. (Today’s decision need not address the instance where goods are received at a point in the United States for export. Nor is it necessary to decide if Carmack applies to goods initially received in Canada or Mexico, for import into the United States. See infra, at 107.)
The present cases illustrate the operation of these principles. Carmack did not require “K” Line to issue bills of lading because “K” Line was not a receiving rail carrier. “K” Line obtained the cargo in China for overseas transport *104 across an ocean and then to inland destinations in the United States. “K” Line shipped this property under COGSA-authorized through bills of lading. See supra, at 94-95. That “K” Line chose to use rail transport to complete one segment of the journey under these “essentially maritime” contracts, Kirby, 543 U. S., at 24, does not put “K” Line within Carmack’s reach and thus does not require it to issue Carmack bills of lading.
As for Union Pacific, it was also not a receiving rail carrier under Carmack. The cargo owners conceded at oral argument that, even under their theory, Union Pacific was a mere delivering carrier, which did not have to issue its own Car-mack bill of lading. See Tr. of Oral Arg. 29, 39. This was a necessary concession. A carrier does not become a receiving carrier simply by accepting goods for further transport from another carrier in the middle of an international shipment under a through bill. After all, Union Pacific was not the “initial carrier” for the carriage. Mexican Light, 331 U. S., at 733.
If a carrier like Union Pacific, which acts as a connecting or delivering carrier during an international through shipment, was, counterintuitively, a receiving carrier under Carmack, this would in effect outlaw through shipments under a single bill of lading. This is because a carriage like the one in the present case would require two bills of lading: one that the overseas carrier (here, “K” Line) issues to the cargo owners under COGSA, and a second one that the first domestic rail carrier (here, Union Pacific) issues to the overseas carrier under Carmack. Kirby noted “the popularity of Through’ bills of lading, in which cargo owners can contract for transportation across oceans and to inland destinations in a single transaction.” 543 U. S., at 25-26. The Court sees no reason to read COGSA and Carmack to outlaw this efficient mode of international shipping by requiring these journeys to have multiple bills of lading. In addition, if Union Pacific had to issue a Carmack bill of lading to “K” *105 Line, it is unclear whether the cargo owners (the parties Carmack is designed to protect) would be able to sue under the terms governing that bill, especially in light of their different through bill with “K” Line. These difficulties are reason enough to reject this novel interpretation of Car-mack, which was neither urged' by any party nor adopted by any authority that has been called to this Court’s attention.
This would be a quite different case if, as in Reider, the bills of lading for the overseas transport ended at this country’s ports and the cargo owners then contracted with Union Pacific to complete a new journey to an inland destination in the United States. Under those circumstances, Union Pacific would have been the receiving rail carrier and would have been required to issue a separate Carmack-compliant bill of lading to the cargo owners. See Reider, 339 U. S., at 117 (“If the various parties dealing with this shipment separated the carriage into distinct portions by their contracts, it is not for courts judicially to meld the portions into something they are not”).
The Court of Appeals interpreted Carmack as applying to any domestic rail segment of an overseas shipment, regardless of whether Carmack required a bill of lading. The court rested on the assumption that the “[STB]’s jurisdiction . . . is coextensive with Carmack’s coverage.” 557 F. 3d, at 992. Yet, as explained above, Carmack applies only to shipments for which Carmack requires a bill of lading; that is to say, to shipments that start with a carrier that is both subject to the STB’s jurisdiction and “receives [the property] for [domestic rail] transportation.” The Court of Appeals ignored this “receive[d] ... for transportation” limitation and so reached the wrong conclusion. See, e. g., Reiter v. Sonotone Corp., 442 U. S. 330, 339 (1979) (courts are “obliged to give effect, if possible, to every word Congress used”).
The Court of Appeals’ conclusion is also an awkward fit with Carmack’s venue provisions. Under Carmack, a suit *106 against the “originating” (that is, receiving) rail carrier that has not actually caused the damage to the goods “may only be brought ... in the judicial district in which the point of origin is located.” §§ 11706(d)(2)(A), (A)(i). Suit against either a delivering carrier or any carrier that caused the damage, by contrast, may be brought in various other districts. See §§ 11706(d)(2)(B), (C). “[Jjudicial district” refers to “district court of the United States or in a State Court.” § 11706(d)(1). Carmack’s venue provisions presume that the receiving carrier obtains the property in a judicial district within the United States. Here, the journey’s “point of origin” was China, so Carmack’s venue provisions reinforce the interpretation that Carmack does not apply to this carriage.
Indeed, if “K” Line were a receiving carrier in a case where the journey’s “point of origin” was China, there would be no place under Carmack to sue “K” Line, since China is not within a judicial district “of the United States or in a State court.” Ibid. Carmack’s original premise is that the receiving carrier is liable for damage caused by the other carriers in the delivery chain. This premise would be defeated if there were no venue in which to sue the receiving rail carrier, as opposed to suing a different carrier under one of Carmack’s other venue provisions and then naming the receiving carrier as a codefendant. The far more likely conclusion is that “K” Line is not a receiving rail carrier at all under Carmack, and thus Carmack, including its venue provisions, does not apply to property shipped under “K” Line’s through bills. True, if the sole question were one of venue, suit could still be brought against the carrier that caused the damage or the delivering carrier. But the issue need not be explored here, for, as the Court holds, Carmack is inapplicable in these cases.
B
Carmack’s statutory history supports the conclusion that it does not apply to a shipment originating overseas under a *107 through bill. None of Carmack’s legislative versions have applied to the inland domestic rail segment of an import shipment from overseas under a through bill.
Congress enacted Carmack in 1906, as an amendment to the Interstate Commerce Act. At that time, the amendment’s provisions applied only to “property for transportation from a point in one State to a point in another State.” § 7, 34 Stat. 595. Congress amended Carmack in 1915, § 1, 38 Stat. 1197, and the relevant language remained unchanged until Carmack was recodified in 1978. Under the pre-1978 language, Carmack’s bill of lading provisions applied not only to wholly domestic rail transport but also to cargo “received] ... for transportation” “from any point in the United States to a point in an adjacent foreign country.” 49 U. S. C. §20(11) (1976 ed.).
Even if there could be some argument that the Carmack Amendment before 1978 applied to imports from Canada and Mexico because the phrase “from . . . to” could also mean “between,” cf. Reider, supra, at 118 (explicitly not deciding this issue), the Court is unaware of any authority holding that the Carmack Amendment before 1978 applied to cargo originating from nonadjacent overseas countries under a through bill. See, e. g., In re The Cummins Amendment, 33 I. C. C. 682, 693 (1915); Brief for Respondents 8 (effectively conceding this point).
In 1978, Congress adopted the Carmack Amendment in largely its current form. § 1, 92 Stat. 1337. Congress in the statute itself stated that it was recodifying Carmack and instructed that this recodification “may not be construed as making a substantive change in the la[w].” §3(a), id., at 1466; see Burlington Northern R. Co. v. Oklahoma Tax Comm’n, 481 U. S. 454, 457, n. 1 (1987). By interpreting the current version of the Carmack Amendment to cover cargo originating overseas, the Court of Appeals disregarded this direction and dramatically expanded Carmack’s scope beyond its historical coverage.
*108 Finally, in 1995, Congress reenacted Carmack. But that reenactment evidenced no intent to affect the substantive change that the Court of Appeals’ decision would entail. See § 102(a), 109 Stat. 847-849. There is no claim that the 1995 statute altered Carmack’s text in any manner relevant here, as that reenactment merely indented subsections of Carmack for readability. Cf. United States v. O’Brien, 560 U. S. 218, 233-234 (2010) (“[C]urrent legislative drafting guidelines ... advise drafters to break lengthy statutory provisions into separate subsections that can be read more easily”).
C
Where the text permits, congressional enactments should be construed to be consistent with one another. And the interpretation of Carmack the Court now adopts attains the most consistency between Carmack and COGSA. First, applying Carmack to the inland segment of an international carriage originating overseas under a through bill would undermine Carmack’s purposes. Carmack is premised on the view that the shipment has a single bill of lading and any damage during the journey is the responsibility of both the receiving and the delivering carrier. See supra, at 98. Yet, under the Court of Appeals’ interpretation of Carmack, there would often be no venue in which to sue the receiving carrier. See supra, at 106.
Applying two different bill of lading regimes to the same through shipment would undermine COGSA and international, container-based multimodal transport. As Kirby explained, “[t]he international transportation industry 'clearly has moved into a new era — the age of multimodalism, door-to-door transport based on efficient use of all available modes of transportation by air, water, and land.’ ” 543 U. S., at 25 (quoting 1 T. Sehoenbaum, Admiralty and Maritime Law 589 (4th ed. 2004)). If Carmack applied to an inland segment of a shipment from overseas under a through bill, then one set of liability and venue rules would apply when cargo is dam *109 aged at sea (COGSA) and another almost always would apply when the damage occurs on land (Carmack). Rather than making claims by cargo owners easier to resolve, a court would have to decide where the damage occurred to determine which law applied. As a practical matter, this requirement often could not be met; for damage to the content of containers can occur when the contents are damaged by rough handling, seepage, or theft, at some unknown point. See H. Kindred & M. Brooks, Multimodal Transport Rules 143 (1997). Indeed, adopting the Court of Appeals’ approach would seem to require rail carriers to open containers at the port to check if damage has been done during the sea voyage. This disruption would undermine international container-based transport. The Court will not read Congress’ nonsubstantive recodification of Carmack in 1978 to create such a drastic sea change in practice in this area.
Applying Carmack’s provisions to international import shipping transport would also undermine the “purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea.” Kirby, supra, at 29. These cases provide an apt illustration. The sophisticated cargo owners here agreed to maritime bills of lading that applied to the inland segment through the Himalaya Clause and authorized “K” Line to subcontract for that inland segment “on any terms whatsoever.” The cargo owners thus made the decision to select “K” Line as a single company for their through transportation needs, rather than contracting for rail services themselves. The through bills provided the liability and venue rules for the foreseeable event that the cargo was damaged during carriage. Indeed, the cargo owners obtained separate insurance to protect against any excess loss. The forum-selection clause the parties agreed upon is “an indispensable element in international trade, commerce, and contracting” because it allows parties to “agre[e] in advance on a forum acceptable” to them. The Bremen v. Zapata Off-Shore Co., 407 U. S. 1, 13-14 (1972). A clause of this *110 kind is enforced unless it imposes a venue “so gravely difficult and inconvenient that [the plaintiff] will for all practical purposes be deprived of his day in court.” Id., at 18. The parties sensibly agreed that because their bills were governed by Japanese law, Tokyo would be the best venue for any suit relating to the cargo.
The cargo owners’ contrary policy arguments are unavailing. They assert that if Carmack does not apply, the inland segment of international shipments will be “unregulated.” Brief for Respondents 2, 21, 24, 64, 91. First, any speculation that not applying Carmack to inland segments of overseas shipments will cause severe problems is refuted by the fact that Carmack even arguably did not govern the inland portion of such shipments from its enactment in 1906 until its nonsubstantive recodification in 1978. See supra, at 107. It is true that if the cargo owners’ position were to prevail, the terms of through bills of lading made in maritime commerce would be more restricted in some circumstances. But that does not mean that the Court’s holding leaves the field unregulated. Ocean-based through bills are governed by COGSA, and ocean vessels like those operated by “K” Line are overseen by the Maritime Commission. Supra, at 96. Rail carriers like Union Pacific, furthermore, remain subject to. the STB’s regulation to the extent they operate within the United States. See supra, at 105. It is notable that although the STB has jurisdiction to regulate the rates of such carriers, even when the carriage is not governed by the Carmack Amendment, the STB has exercised its authority to exempt from certain regulations service provided by a rail carrier “as part of a continuous intermodal freight movement,” 49 CFR § 1090.2 (2009), like the journey at issue in these cases, see ibid, (exercising the STB’s deregulation authority under 49 U. S. C. § 10502(f)).
Finally, the cargo owners miss the mark in relying on the recent United Nations Convention on Contracts for the International Carriage of Goods Wholly or Partly by Sea, *111 which has yet to be “ratified by the President with the advice and consent of the Senate.” Brief for United States as Amicus Curiae 11. These so-called “Rotterdam Rules” would explicitly allow the inland leg of an international shipment to be governed by a different legal regime than the ocean leg, under some circumstances. See G. A. Res. 63/122, art. 26, U. N. Doc. A/RES/63/122 (Dec. 11, 2008). Nothing in the Rotterdam Rules, however, requires every country to mandate a different regime to govern the inland rail leg of an international through shipment; and, as explained above, Congress, by enacting COGSA, has opted for allowing shipments governed by a single through bill. And if the objection is that today’s decision will undermine the results of these international negotiations in some way, that concern is met by the fact that the United States Government has urged the result the Court adopts today. See Brief for United States as Amicus Curiae 13-29.
Congress has decided to allow parties engaged in international maritime commerce to structure their contracts, to a large extent, as they see fit. It has not imposed Carmack’s regime, textually and historically limited to the carriage of goods received for domestic rail transport, onto what are “essentially maritime” contracts. Kirby, 543 U. S., at 24.
V
“K” Line received the goods in China, under through bills for shipment into the United States. “K” Line was thus not a receiving rail carrier under Carmack and was not required to issue bills of lading under that amendment. Union Pacific is also not a receiving carrier for this carriage and was thus not required to issue Carmack-compliant bills. Because the journey included no receiving rail carrier that had to issue bills of lading under Carmack, Carmack does not apply. The parties’ agreement to litigate these cases in Tokyo is binding. The cargo owners must abide by the contracts they made.
*112 * * *
The judgment of the Court of Appeals for the Ninth Circuit is reversed, and the cases are remanded for further proceedings consistent with this opinion.

It is so ordered.