08-5184-cv
Mitsui Sumitomo Insurance Co., Ltd. v. Evergreen Marine Corp.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: September 10, 2009    Decided: September 22, 2010)

Docket No. 08-5184-cv

MITSUI SUMITOMO INSURANCE CO., LTD.,

*Plaintiff-Appellee,*

–v.–

EVERGREEN MARINE CORP.,

*Defendant-Cross-Claimant-Appellant,*

UNION PACIFIC RAILROAD COMPANY,

*Defendant-Cross-Defendant-Appellant.*

Before:  B.D. PARKER, WESLEY, *Circuit Judges*, and RESTANI, *Judge.*[*]

Appeal from an order entering partial summary judgment in favor of plaintiff, and holding that the Carmack Amendment applies to the international intermodal shipment at issue in this case. Although the district court applied binding precedent at the time, an intervening decision of the Supreme Court has abrogated that authority. *See Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433 (2010). Under *Regal-Beloit*, the Carmack Amendment does not apply.

REVERSED and REMANDED.

---

[*]    The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

JOSEPH DE MAY, JR. (Paul M. Keane, *on the brief*), Cichanowicz, Callan, Keane, Vengrow & Textor, LLP, New York, NY, *for Appellant Evergreen Marine Corp.*

BARRY N. GUTTERMAN, Barry N. Gutterman & Associates, P.C., New York, NY, *for Appellant Union Pacific Railroad Co.*

DAVID L. MAZAROLI, New York, NY, *for Appellee Mitsui Sumitomo Insurance Co., Ltd.*

PER CURIAM:

This is another "maritime case about a train wreck." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18 (2004). We are again asked which federal statutory scheme governs the extent of the parties' liability: the Carmack Amendment, 49 U.S.C. § 11706, which imposes something akin to strict liability on shippers; or the Carriage of Goods and Sea Act ("COGSA"), 46 U.S.C. § 30701 note, which creates negligence-based liability with a $500-per-package damages cap.

Relying on our decision in *Sompo Japan Insurance Co. of America v. Union Pacific Railroad Co.* ("*Sompo*"), 456 F.3d 54 (2d Cir. 2006), the district court held that the Carmack Amendment applied. *See Mitsui Sumitomo Ins. Co. v. Evergreen Marine Corp.*, 578 F. Supp. 2d 575, 584 (S.D.N.Y. 2008). However, the Supreme Court has since held otherwise

2

and abrogated *Sompo* in a case involving facts that are materially indistinguishable from the one now before us. *See Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.* ("*Regal-Beloit*"), 130 S. Ct. 2433, 2443 (2010). Accordingly, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

Mitsui Sumitomo Insurance Co., Ltd. ("Mitsui") commenced this action as the subrogor of non-party Asmo North Carolina, Inc. ("Asmo").  Asmo imports, manufacturers, and distributes motorized automotive parts.  In March 2006, Asmo purchased on FOB terms a shipment of motors and other parts from an affiliate in Japan.  The affiliate arranged for the cargo to be shipped from Shimizu, Japan to Asmo's facilities in Statesville, North Carolina.

Evergreen Marine Corp. ("Evergreen") was hired to transport the cargo.  The job required ocean carriage from Japan to the Port of Los Angeles and rail carriage from the port to North Carolina.  Evergreen — a vessel operating common carrier ("VOCC") — issued an intermodal through waybill relating to the entire shipment from Japan to North

Carolina (the "Waybill").[1] The Waybill did not reference the Carmack Amendment. Instead, it contained provisions that: (1) indicated that COGSA's terms governed the carriage, subject to certain exceptions not pertinent here; (2) authorized Evergreen to enter into subcontracts to complete the shipment; and (3) extended the defenses and liability limitations available under the Waybill to any subcontractors engaged by Evergreen.[2]

Evergreen entered into a subcontract with the Union Pacific Railroad Company ("UP"), which agreed to ship the cargo by rail from the Port of Los Angeles to North Carolina

---

[1] A waybill typically functions in the same way as a bill of lading, except that it is non-negotiable. *See Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc. ("Royal & Sun")*, 612 F.3d 138, 142 n.6 (2d Cir. 2010). The document serves to acknowledge that the carrier has received the goods, and it operates as a contract for the carriage. *See id.* at 141 nn.3 & 5. The term "intermodal" indicates that the waybill covered "multiple modes of transport — that is, more than one of truck, rail, sea, and air." *Id.* at 141 n.4.

[2] In the parlance of the maritime shipping industry, the provision of the Waybill that indicated that COGSA supplied the governing law regarding shippers' liability is known as a "Clause Paramount." *See Royal & Sun*, 612 F.3d at 142 & n.6. The Waybill's Clause Paramount purported to extend COGSA's application "beyond the tackles," *i.e.*, to the inland portion of the shipment. *Id.* at 142 & n.7. The provision of the Waybill that permitted Evergreen's subcontractors to invoke COGSA's liability limitations is known as a Himalaya Clause. *See id.* at 142 & n.9.

4

under the terms of a standing contract titled the "Exempt Rail Transportation Agreement" ("ERTA"). The ERTA incorporated by reference the then-existing version of UP's "Exempt Circular Master Intermodal Transportation Agreement" ("MITA-2A"). Like the Waybill, the MITA 2-A sought to limit UP's liability exposure in the event of damage to the cargo. It stated, *inter alia*, that: (1) UP's "maximum liability for US inland loss or damage shall be limited to $500.00 per package," the same damages cap imposed by COGSA; and (2) in order to qualify for "full-value liability" coverage under the Carmack Amendment, the shipper was required to notify UP of the full value of the cargo and to prepay an increased rate.

"In practice almost all shippers decline to declare a value, because a maritime insurance company is generally willing to assume the risk of loss or damage for a cheaper price than the carrier would be." *Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc.* ("*Royal & Sun*"), 612 F.3d 138, 142 n.8 (2d Cir. 2010). That is precisely what happened here. Neither Asmo nor its affiliate declared the full value of the cargo or paid increased shipping rates, and Asmo instead purchased insurance on the shipment from

Mitsui. Evergreen subsequently took possession of the cargo in Japan, delivered it to the Port of Los Angeles via a vessel known as the "Ever Union," and transferred it to UP without incident. However, UP's train derailed near Nigginson, Arkansas, causing the property damage at the center of the parties' dispute.

Mitsui paid Asmo $385,105.70 on the insurance policy, and then brought claims against Evergreen and UP. Evergreen filed crossclaims against UP, and UP ultimately admitted liability to Mitsui and took up Evergreen's defense. Following discovery, "[t]he only live issue in [the] case [was] the amount of damages owed." *Mitsui Sumitomo Ins. Co.*, 578 F. Supp. 2d at 579. The parties filed cross-motions for partial summary judgment on that basis. Mitsui argued that Evergreen and UP were liable for the full value of the damages under the Carmack Amendment, which "imposes something close to strict liability upon originating and delivering carriers." *Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 9 (1st Cir. 2003). Evergreen and UP argued that, under COGSA and all the relevant agreements, their financial exposure was capped at $500 per package. The district court held that the Carmack Amendment governed and entered

6

judgment in favor of Mitsui.

## II. DISCUSSION

The foundation of the district court's holding that the Carmack Amendment applies in this case was our decision in *Sompo*, 456 F.3d 54. However, as we recently recognized in *Royal & Sun*, 612 F.3d at 138, the Supreme Court abrogated *Sompo* and its progeny in *Regal-Beloit*, 130 S. Ct. at 2443. Under *Regal-Beloit*, the Carmack Amendment does not apply to the shipment in this case.

The shipment in *Regal-Beloit* was nearly identical to the one here. The cargo owners hired "K" Line, a VOCC, to ship cargo from China to the Midwestern United States pursuant to bills of lading issued by "K" Line. *Id.* at 2439.[3] The bills of lading contained terms that were similar in most material respects to the terms of Evergreen's Waybill. *See id.* (noting that "K" Line's bills of lading selected COGSA as the applicable liability regime,

---

[3] In *Regal-Beloit*, the Supreme Court addressed two separate disputes with similar parties. The respondents were all either cargo owners or insurance firms acting as subrogors of cargo owners. *See* 130 S. Ct. at 2439. In both cases, "K" Line was hired to provide intermodal transportation services, it issued intermodal through bills of lading, and it subcontracted with UP for a portion of those services. *See id.*

permitted subcontracting, extended COGSA beyond the tackles, and contained a Himalaya Clause). "K" Line subcontracted with UP — a party common to *Regal-Beloit* and this case — to transport the cargo over the inland United States via rail. *See id.* "K" Line successfully shipped the cargo from China to California and transferred it to UP, but a rail accident caused damage to the cargo while it was in UP's possession. *See id.*

Answering a question it had not previously addressed, *see Sompo*, 456 F.3d at 74, the Supreme Court held that the Carmack Amendment did not apply to an intermodal shipment that originated outside the United States and was performed pursuant to a single through bill of lading issued by a VOCC. Rather, Carmack only applies to a shipment of goods where a "receiving rail carrier" — as opposed to a "delivering" or connecting rail carrier, *see* 49 U.S.C. § 11706(a) — is required to issue a Carmack-compliant contract for the carriage of goods. *Regal Beloit*, 130 S. Ct. at 2444. This new standard requires that two conditions be met before the Carmack Amendment applies to a shipment. "First, the rail carrier must 'provid[e] transportation or service subject to the jurisdiction of the [Surface Transportation

8

Board ("STB")].' Second, that carrier must 'receiv[e]' the property 'for transportation under this part,' where 'this part' is the STB's jurisdiction over domestic rail transport." *Id.* (quoting 49 U.S.C. § 11706) (alterations in original).

As we have noted, the Supreme Court's application of these principles to the facts of *Regal-Beloit* was "straightforward." *Royal & Sun*, 612 F.3d at 144. "'K' Line received the cargo in China for intermodal transport, not in the United States for rail transport." *Id.* at 145. Therefore, it was not a "receiving rail carrier" for purposes of the Carmack Amendment. The Supreme Court reached the same conclusion as to UP, reasoning that it would be "counterintuitive[]" to consider a "connecting or delivering carrier during an international through shipment" to be a "receiving rail carrier" under the Carmack Amendment. *Regal Beloit*, 130 S. Ct. at 2445. Such an interpretation of the statute "would in effect outlaw through shipments under a single bill of lading," which is a more "efficient mode of international shipping." *Id.*

Following *Regal-Beloit*, decided while this appeal was *sub judice*, we invited the parties to submit supplemental

9

briefing regarding the effect of the Supreme Court's decision. Having reviewed the parties' submissions, we are persuaded that the Carmack Amendment does not apply. Evergreen is not a "receiving rail carrier." It "receive[d] the property at the shipment's point of origin" in Japan, and it took possession of the cargo to perform "overseas multimodal import transport, not domestic rail transport." *Id.* at 2444.[4] Moreover, as in *Regal-Beloit*, the same is true of UP. A rail carrier "does not become a receiving carrier simply by accepting goods for *further transport* from another carrier *in the middle* of an international shipment under a through bill." *Id.* at 2445 (emphases added). Therefore, Carmack does not apply to either Evergreen or UP.

In an attempt to evade the holding of *Regal-Beloit*, Mitsui presents a series of unpersuasive arguments in its

---

[4] Citing *Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.*, 547 F.3d 351 (2d Cir. 2008), Mitsui asserts that *Regal-Beloit* "did not address whether a multimodal carrier who issues a through bill of lading for combined ocean and land carriage can itself be a rail carrier." However, under *Regal-Beloit*, the pertinent question is whether the carrier functioned as a *receiving* rail carrier. The Court plainly addressed that narrower issue and found that "K" Line did not meet that definition. Applying its analysis, we reach the same conclusion in this case as to Evergreen. Moreover, to state the obvious, to the extent *Regal-Beloit* charts a different course for Carmack analysis than we set *Rexroth*, the Supreme Court's decision abrogates ours.

10

supplemental brief. First, it argues that the Supreme Court reached its conclusion as to UP based on a concession at oral argument by the railroad's counsel that UP was a "mere delivering carrier" in that case. *Regal-Beloit*, 130 S. Ct. at 2445. This assertion misreads the Supreme Court's opinion. Although the *Regal-Beloit* Court noted the concession by UP's counsel, it characterized the concession as a "necessary" one under the terms of the statute. *Id.* We therefore readily reject Mitsui's contention that the lack of such a concession in this case warrants a different outcome.

Second, Mitsui asserts that *Regal-Beloit* is distinguishable because, in this case, UP transported the cargo pursuant to a "separate bill of lading for the interstate rail carriage," presumably referring to the MITA-2A and the ERTA. The Supreme Court did not describe the documents that governed UP's carriage of the cargo at issue in *Regal-Beloit*. However, this is a distinction without a difference. Like "K" Line's bills of lading in *Regal-Beloit*, the Waybill issued by Evergreen called for transportation between Japan and North Carolina. The Port of Los Angeles was a midpoint along that journey, not a

11

second, separate point of origin.

The Supreme Court indicated that it "would be a quite different case if . . . the bills of lading for the overseas transport *ended* at this country's ports and the cargo owners then contracted with [UP] to complete a *new journey* to an inland destination in the United States."  130 S. Ct. at 2445 (emphases added).  But this is not such a case.  The MITA-2A and the ERTA did not call for a "new journey."  Collectively, the documents represented a subcontract between Evergreen and UP for the inland portion of the carriage.  Such subcontracts were expressly contemplated by the Waybill and, under *Regal-Beloit*, they fall outside the purview of the Carmack Amendment.

Third, Mitsui asserts that the Supreme Court also relied "in large part on the determination that suit could not be filed in a Carmack-compliant venue, i.e. a district court in the United States."  The observation is correct to some extent, but nevertheless unavailing.  In *Regal-Beloit*, the Court reasoned that Carmack's venue-selection provisions reinforced its conclusion.  *Id.* at 2445-46.  Specifically, a suit against a receiving rail carrier "that has not actually caused the damage to the goods" — such as "K" Line, or

12

Evergreen in this case — "'may only be brought . . . in the judicial district in which the *point of origin is located*.'" *Id.* at 2446 (emphasis added) (quoting 49 U.S.C. § 11706(d)(2)(A)(i)). The term "judicial district" refers to state and federal courts within the United States. *See* 49 U.S.C. § 11706(d)(2)(B). However, China was the "point of origin" of the shipment in *Regal-Beloit*. And, if the Carmack Amendment applied, there would be no "judicial district[s]" in which suit could be brought in that country. "The far more likely conclusion," the Supreme Court reasoned, "is that 'K' Line is not a receiving rail carrier at all under Carmack, and thus Carmack, including its venue provisions, does not apply to property shipped under 'K' Line's through bills." *Regal-Beloit*, 130 S. Ct. at 2446.

Mitsui contends that this case is different because Evergreen's Waybill provides that "all claims arising hereunder must be brought and heard solely" in the federal or state courts of New York. But this fact does no violence to the Supreme Court's observation that its conclusion was consistent with the Carmack Amendment's venue provisions. Whatever the parties' agreements may say about venue and choice of law, Japan is the "point of origin" of the

13

shipment at issue.  There is no "judicial district," for purposes of the Carmack Amendment, "in which the point of origin is located."  49 U.S.C. § 11706(d)(2)(A)(i).  As such, even if we were to somehow shoehorn Evergreen or UP into the category of a receiving rail carrier, we would be left with "an awkward fit with Carmack's venue provisions." *Regal-Beloit*, 130 S. Ct. at 2446.  As in *Regal-Beloit*, this point "reinforce[s] the interpretation that Carmack does not apply to this carriage."  *Id.*

Finally, Mitsui argues that *Regal-Beloit* should not be applied retroactively.  Although this issue was not directly addressed in *Royal & Sun*, that case was pending on direct appeal when the Supreme Court issued its decision, and we applied the holding of *Regal-Beloit* retroactively to those parties.  *See Royal & Sun*, 612 F.3d at 138.  This application was consistent with the principle that when the Supreme Court or this Court "'applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review.'"  *Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 91 (2d Cir. 2009) (quoting *Harper v. Va. Dep't of*

14

*Taxation*, 509 U.S. 86, 97 (1993)).  The Supreme Court applied its holding to the parties before it in *Regal-Beloit*, as did we in *Royal & Sun*.  Therefore, we now make clear that *Regal-Beloit* applies retroactively to all cases open on direct review at the time the Supreme Court issued its decision.

### III. CONCLUSION

For the foregoing reasons, under *Regal-Beloit*, the Carmack Amendment does not apply to the shipment at issue in this case.  Accordingly, the judgment of the district court, which was entered without the benefit of the Supreme Court's guidance, is hereby **REVERSED** and the case is **REMANDED** for further proceedings consistent with this decision.